**CHRISTIE–SPENCER CORPORATION,**
Plaintiff,

v.

**HAUSMAN REALTY CO., INC., Dorothy Kahn, Nancy H. Blumenthal, and Robert Todd Lang and Stephen D. Kahn, as Executors of the Estate of Robert James Hausman, Mimi Cleaners Inc., Bernard Grossman, and Thomas Grossman, Defendants.**

No. 00 Civ. 7801(CM).

United States District Court,
S.D. New York.

Oct. 23, 2000.

Steven Russo, Sive, Paget & Riesel, P.C., New York City, for plaintiff.

Michael B. Gerrard, Heidi Wendel, Arnold & Porter, New York City, for defendants.

**MEMORANDUM ORDER DENYING REQUEST FOR PRELIMINARY INJUNCTION AND DISSOLVING TEMPORARY RESTRAINING ORDER**

McMAHON, District Judge

Christie–Spencer Corp. brings this action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, the Resource Conservation and Recovery Act, as amended ("RCRA"), 42 U.S.C. § 6901 *et seq.*, the New York Navigation Law § 176 and 181(5), and New York State common law against Hausman Realty Co, Inc. ("HRC"), its predecessors in interest Dorothy Kahn, Nancy Blumenthal and Robert J. Hausman, and Mimi Cleaners, Inc., Bernard Grossman and Thomas Grossman (the "Mimi Defendants") for environmental damage caused by Mimi Cleaners, the former subtenant of plaintiff's building at 58 Christie Place, Scarsdale, New York (the "Site").

In July 2000, HRC, which holds a ground lease on the subject property through 2012, commenced work under an agreement with the New York State Department of Environmental Conservation (DEC) to clean the site of certain hazardous chemicals that had been released from Mimi's dry cleaning operation. Pursuant to its agreement with DEC, HRC undertook to remove over 70 tons of soil located under the building. In the process, HRC discovered that the contamination extended beyond the perimeter of the excavation. On the advice of environmental engineers, HRC began installing a system of pipes and pumps below the surface of the site to perform an operation known as a "soil vapor extraction" ("SVE"). Over time the SVE system will remove most of the remaining contamination, in a manner explained below. Once this system is in, defendants plan to re-seal the floor and then sub-let the property to new tenants.

Even though DEC has approved of defendant's approach, plaintiff seeks a mandatory preliminary injunction requiring HRC to fully remediate all contamination at the Site—including potential bedrock and groundwater contamination. To that end, plaintiff originally asked this court to enjoin HRC from completing installation of the SVE system, and to order HRC to remove any and all contaminated soils from under its property. At oral argument on the motion for injunction, plaintiff also demanded that, at a minimum, defendant HRC be ordered to test the bedrock under the site and adjacent groundwater (if any) for contamination, and to remediate it. They seek an injunction *pendente lite* on the grounds that HRC's planned actions (1) pose an imminent and substantial danger to the public health in violation of RCRA; (2) violate Article Four, which require HRC to keep the property in good repair and to comply with all laws and regulations relating to the property; and (3) constitute "alterations" in excess of $1,000 which, under Article 23 of the ground lease from Christie–Spencer, require the owner's permission.

For the following reasons, plaintiff's request for a preliminary injunction is denied.

### FINDINGS OF FACT

*The ground lease*

Christie–Spencer ("Christie"), a New York corporation, is the owner of real property located at 58 Christie Place, Scarsdale, New York, in a commercial area of downtown Scarsdale. Defendant HRC operates a small shopping center on the Site, pursuant to a ground lease dated October 15, 1951 (the "ground lease"). The site is upgrade from the Bronx River, although separated from the river by several city blocks and the Scarsdale Metro–North tracks and terminal.

The prior owner of the Site, Parkway–Spencer Corp., entered into the initial lease with a company called Marx B. Hausman. As a result of a series of assignments of the ground lease on both sides, on August 1, 1959, Christie became the lessor, and on July 1, 1961, HRC became the lessee. The ground lease has been renewed twice and runs through December 31, 2012.

Defendants Dorothy Kahn, Nancy Blumenthal, and Robert Hausman,[1] predecessors in interest to HRC, sublet the Site to defendants Mimi Cleaners, Inc., Bernard Grossman and Thomas Grossman ("Mimi") or their predecessors in interest. The Site is currently vacant and has been for at least a year. Other retail establishments occupy adjacent stores in the same building. The U.S. Post Office stands next door.

In the ground lease, HRC agreed to keep the Site in good repair, and to comply—and to ensure that its subtenant Mimi Cleaners complied—with all laws, regulations, rules and requirements of every kind, with respect to the Site. HRC also agreed to pay the full cost of any failure by it or its subtenant to comply with these laws and regulations. (Pl.Compl. at Exh. A at 9.) The ground lease also requires HRC to indemnify Christie–Spencer "from all expense and/or damages by reason of any notices, orders, violations or penalties filed against or imposed upon the premises, or against [Christie] as owner thereof, because of the failure of [HRC] to comply with [all laws and regulations]." (Id. at 9–10.)

Article Twenty–Third of the lease also prohibits HRC from making any alterations to the Site that cost more than $1,000 without Christie's prior written consent, but says that the Lessor shall "not withhold unreasonably such consent from the Lessee." (Id. at 7.)

*Site contamination*

Mimi operated a dry cleaning business at the Site from 1954 until 1999. Mimi

---

**1.** Robert Todd Lang and Stephen D. Kahn are executors of Hausman's estate.

Cleaners used a solvent known as perchloroethylene ("PCE"), a volatile organic compound widely used in the chemical dry cleaning industry.

During an inspection of the site in 1998 (which was at the time or shortly before Mimi Cleaners closed), HRC observed conditions that led HRC to suspect that hazardous substances had been released at the Site. HRC therefore hired Chazen Environmental Services, Inc. ("Chazen"), an environmental consulting firm, to evaluate environmental conditions at the Site.

Chazen conducted an initial site investigation in late 1998. A visual inspection revealed evidence of PCE spills on the floor around the dry cleaning machine and on the floor near chemical drums and containers throughout the facility. From this Chazen concluded that Mimi Cleaners had released PCE at the Site. In January and February, Chazen took soil samples from underneath the concrete floor within the dry cleaners and at other areas outside the cleaners. It reported its findings in March 1999.

Chazen reported concentrations of PCE and its degradation product dichloroethylene ("DCE") in the soil under and within the vicinity of the dry cleaning equipment. The tests indicated levels of contaminants of 9.9 mg/kg under the floor slab. This was below the recommended soil cleanup objective for human health listed in the New York State Department of Environmental Conservation ("DEC") TAGM # 4046 of 14 mg/kg. It was also below the Risk–Based Concentration (RBC) for residential health for PCE of 12 mg/kg provided by USEPA Region III. It thus appeared that the Site did not pose a danger to human health. However, the tests indicated PCE concentrations at levels above the DEC (TAGM # 4046) recommended soil cleanup objectives of 1.4 mg/kg. (Savarese Decl. at Exh. C at 2–1.) The TAGM # 4046 soil cleanup objectives were developed by the State to protect groundwater. (Savarese Decl. at Exh. A at 5.)

In its report, Chazen described the geology of the Site:

The material just below the slab consisted of construction fill material of varying grain size. The soils encountered beneath the cellar floor were primarily made up of gray, medium to coarse sand and gravel with little to some silt. The soils beneath the cellar were saturated at a depth of approximately one-foot below grade. The fill material beneath the slab supporting the dry-cleaning machine was primarily brown fine to coarse sand with little fine to medium gravel. The soils were moist in some instances, but not saturated.

(Id. at 2–3.) Chazen found bedrock below the soil "at relatively shallow depth in all borings." (Id. at 3.) The bedrock was "at about three to four feet beneath the cellar and between two and seven feet throughout the building." (Id.)

*Preliminary bedrock contamination considerations*

Chazen noted that the bedrock was "fairly dense" and "may be dense enough so that it acts as a boundary to contaminant migration." However, if the bedrock was "modified by construction activities," Chazen opined that this "could have implication for contaminant transport." (Id. at 1–2.) In other words, blasting or ripping the rock could change it from a "barrier" to a method of transporting contaminants down into the bedrock. Chazen did not investigate possible contamination of the bedrock layer or any groundwater systems below the bedrock.

In a July 1999 letter proposing cleanup services to HRC, its environmental engineering consultants, Lawler, Matusky and Skelly ("LMS"), informed HRC of the possibility of bedrock contamination:

The concentrations reported for the site by the contract laboratory include some high values that indicate to us the likelihood that product was historically released at the site. If that was the case, some PCE would have likely penetrated

the bedrock, potentially as dense non-aqueous phase liquid (DNAPL).

(Savarese Decl. at Exh. F.) A discussion of HRC's cleanup options followed:

Excavation of the most highly contaminated soil beneath the dry cleaning machines has the advantage of removing the most contaminated material completely in that area of the site. Furthermore, the removal will expose the surface of the bedrock. If there is evidence of contaminant penetration into the rock other technologies can be applied to the surface of the rock to mitigate additional migration.

(Id.) At the time of this letter LMS had not yet begun work, or even opened up the Site to examine it below grade, let alone tested the bedrock for contamination. It was therefore not opining that the bedrock actually was contaminated.

*HRC's voluntary cleanup agreement and work plan*

HRC informed Christie of the contamination in April 1999. In September 1999, HRC applied to the DEC's Voluntary Cleanup Program. In this program, volunteers enter into an agreement with DEC to perform a site cleanup in exchange for a release from the agency from further action seeking costs for investigation and remediation of the contamination. Voluntary cleanup agreements also typically provide for DEC's issuance of "no further action" letters upon satisfactory implementation of the remedial work plan. A "no further action" letter states that a DEC-approved cleanup had been performed at the property. HRC executed a Voluntary Cleanup Agreement ("VCA") with DEC in April 2000.

The VCA requires that any remediation undertaken pursuant to the VCA will not "prevent or interfere significantly with any proposed, ongoing or completed remedial programs at the Site" or "expose the public health or the environment to a significantly increased threat of harm or damage." (Savarese Decl. at Exh. D.) The VCA further contemplates the implementation of additional measures "in the event that contamination previously unknown is encountered," or in the event DEC determines that the remediation is not sufficiently protective of human health and the environment for the contemplated use. (Id.)

LMS submitted a proposed Remediation Work Plan to DEC in May 2000. The objectives of this work plan were to: (1) "[a]scertain the areal extent of contaminated soils in the vicinity of the former dry cleaning machines," and (2) "[e]xcavate and remove the heavily contaminated soils to the extent practical, considering such factors as the structural integrity of the building and any unforeseen obstacles." (Savarese Decl. at Exh. C at 1–3.) LMS planned to remove a portion of the floor inside the Site and excavate PCE-contaminated soil that exceeded DEC-recommended soil cleanup objectives of 1.4 parts per million, as practicable. LMS would also replace the contaminated soil with clean fill, and collect and analyze soil gas and ambient air samples within the retail space to verify that the excavation met DEC cleanup criteria.

In the work plan, LMS addressed the possibility of groundwater contamination:

The [DEC] recommended soil cleanup objective assumes that contaminants located in unsaturated soils will migrate to the groundwater table. Based on the level of contamination detected in the site soils by Chazen, the hypothetical mechanism for potential contamination migration to groundwater would be via surface water infiltration. *However, surface water infiltration is unlikely at the site due to the location of the subsurface soil contamination (within a building and below a concrete slab) and the preponderance of paved surfaces surrounding the site.*

(Savarese Decl. at Exh. C at 2–1.) (emphasis added.) The fact that the area of concern was located within a building, below a

concrete slab, and adjacent to paved or concrete areas "eliminates subsurface contaminant migration via surface water infiltration." In addition, LMS notes Chazen's hypothesis that the bedrock was acting as a boundary to contaminant migration.

Both the Westchester County Department of Health and the Village of Scarsdale have told LMS that there are no known potable wells in the Village of Scarsdale, and therefore no groundwater receptors in the vicinity of the site. (Savarese Decl. at Exh. C at 2–2.)

*Work plan approval*

On June 8, 2000, DEC published notice of the proposed VCA and a request for public comment. The notice stated that as a result of comments submitted DEC "may reevaluate and revise the Remediation Work Plan." (Gerrard Decl. at Exh. B.) DEC Commissioner John Cahill signed the proposed VCA on June 26, 2000.

Christie submitted technical comments on June 29, 2000.[2] In his comments, plaintiff's consultant identified the former Mobil station across the street from Mimi Cleaners as the site of an active spill, and noted that the station owners had identified contaminant migration in a bedrock aquifer. He recommended installation and sampling of bedrock monitoring wells, and noted that there was no consideration in the remedial work plan for identification and remediation of bedrock and/or groundwater contamination. (Girhard Decl. at Exh. A.) DEC made no changes to the plan in response to these comments.

Prior to initiating work, a New York State Department of Health official collected air quality samples from within the Site, adjacent to the Site, and in neighboring businesses and the adjoining hallway. Results of that survey showed no air quality threat to neighboring businesses from PCE contamination.

*The initial cleanup*

According to defendants, LMS began implementing the work plan in June 2000. LMS excavated approximately 72 tons of contaminated soils and concrete and disposed of the material off-site. Based on the average concentration of PCE detected in the samples collected from the excavated material, the cleanup had resulted in the removal of in excess of 15 pounds of PCE contamination, representing a significant source of subsurface contamination. (Williams Aff. ¶ 10.)

LMS tested samples of the soils at the bottom and sidewalls of the excavation. In an August 31, 2000 report to DEC, LMS wrote that it found significantly greater contamination than had been estimated from the earlier sampling conducted by Chazen. Three of the four sidewall samples and one of the base samples exceeded the cleanup goal. LMS conducted additional sampling through the concrete floor slab of the building outside of the excavation area. Its report states:

> Sample results indicate that the PCE concentration generally decreases with distance from the current excavation, however, the concentrations detected for a number of the collected exceeded the remedial goal for PCE of 1.4 mg/kg.

(Savarese Decl. at Exh. E at 3–4.) Based on the Chazen findings and its own tests, LMS estimated that a minimum of 450 tons (300 cubic yards) of subsurface material under the Site exceeded the cleanup objective, and that soil contamination in excess of the objective "may extend beyond the boundary of 58 Christie Place." (Id. at 4.) The report continued:

> Given the size and depth of the excavation, it is unlikely that the operation could be completed in one stage without compromising the building integrity. A staged operation including excavation, disposal, and concrete repair would add

**2.** Defendants contend that "[I]t is standard operating procedure for DEC to sign a VCA prior to receiving public comments," and that "[s]ubsequent to being signed, a VCA remains

subject to any change that DEC in its discretion deems warranted pursuant to comments received." (Def.Mem. at 5.)

significantly to remedial costs. Furthermore, excavation and removal of the accessible contaminated soils may not in itself significantly reduce concerns for possible residual contaminants. Therefore, there is uncertainty as to whether any additional excavation will complete the remediation.

(Id. at 4.) Essentially, LMS considered further excavation impractical, dangerous, and possibly insufficiently effective. Elevated concentrations of contaminants extended toward the south wall of the former cleaner's rooms, where the building structure might be compromised, and digging over a wide area within the building was logistically impossible. (Pease Aff. ¶ 13.)

LMS visually inspected the bedrock exposed by the excavation. It did not see any PCE stains on the bedrock. There were no visible signs of cracks or fissures that would facilitate PCE infiltration into the bedrock. Other than the visual inspection of the exposed rock, LMS did not test the bedrock for contamination. Pease conceded in his testimony that microscopic or hairline cracks in the rock would also absorb contaminants, and these would not be visible by the naked eye. However, he opined that such cracks were more likely if the bedrock had been disturbed during construction of the building. Plaintiff did not introduce any evidence that the bedrock had been disturbed during the construction of the building—in contrast to the Mobil Station, where bedrock infiltration of contaminants could be attributed to the fact that the station's gasoline tanks had been inserted directly into the bedrock, necessitating blasting. (Pease Tr. at 50–51.)

*Soil vapor extraction*

LMS recommended revision of the work plan to include an alternative method of cleaning the soil, called "soil vapor extraction" ("SVE"). SVE is a relatively simple process that physically separates contaminants from the soil in vapor form. SVE systems are designed to remove contaminants such as PCE and its by-products that have a tendency to volatize or evaporate easily. A system of pipes, vacuums, and pumps induces the controlled flow of air and removes volatile organic compounds (VOCs) and semivolaitle organic compounds (SVOCs) from the soil beneath the ground surface in the unsaturated zone—that part of the subsurface located above the water table. The gas leaving the soil may be treated to recover or to destroy the contaminants, depending on local and state air discharge regulations.

SVE is the most frequently selected treatment at Superfund sites. The EPA says SVE is "very effective at removing VOCs from the unsaturated zone." *See* United States Environmental Protection Agency, A Citizen's Guide to Soil Vapor Extraction and Air Sparging, EPA 542–F–96–008 (Apr.1996), <http:// www.epa.gov /swertio1 /products /citguide/ sve.htm>

In its July 1999 letter, LMS described SVE to HRC:

[I]t removes most of the contaminants from the residual soils and bedrock. By its very nature it extends over a wider area and has a beneficial effect on reducing contaminants beyond the ... immediate area, but requires some period of operation and never totally removes all contamination, as excavation would in a limited area. *Especially in sandy soils, however, vapor extraction is usually more economical to reach a given remedial objective.*

(Savarese Decl. at Exh. F.) (emphasis added). In the revised work plan, LMS called SVE "a well-established technology suitable for removal of PCE and its degradation products, especially from sandy soils such as those present at the site. SVE is the presumptive remedy recommended by EPA for PCE contaminated soil." (Savarese Decl. at Exh. E at 4.)

LMS evaluated the proposed system using eight "evaluation factors" for the SVE remedial approach set forth in DEC's hazardous waste cleanup technical guidance.

This evaluation supported the use of SVE for the cleanup. LMS then submitted a revised Work Plan for the Site, and began installing the SVE system on October 5, 2000. Once the system is installed, HRC will be able to reseal the floor and sublease the building to a new tenant.

DEC has continuously monitored the clean-up, and LMS advised the agency of the new contamination and of its proposal for remediation. In an October 16 letter, the DEC concurred with the LMS evaluation that SVE had been proven effective in many similar applications, and "approves in concept SVE as capable of achieving or exceeding the cleanup goals in the originally approved May 2000 remedial work plan." (Williams Aff. at Exh. C.) The DEC said it would review the LMS reports with the Department of Health and would comment on "the details of the SVE system." It added that "[o]peration, maintenance and monitoring protocols are of concern as well as endpoint sampling of soil, soil gas and ambient air to confirm that remedial goals have been met under the [voluntary cooperation agreement]." (Id.) The LMS project supervisor claims that LMS will "await DEC's specific comments prior to replacing the concrete floor slab and completing installation of the SVE system." (Pease Aff. ¶ 18.)

At this time defendants cannot estimate how long the system will need to operate to reach its goals. It may take as few as six and as many as seventy months or more for the system to reach the DEC cleanup objectives. If plaintiff wishes, defendant plans to remove the system upon completion of the cleanup.

*Prior Proceedings*

On Friday, October 13, plaintiff moved by order to show cause for a mandatory preliminary injunction ordering "HRC to take all steps necessary until further order of this Court to fully remediate the hazardous substance contamination at the Site and at neighboring properties to which contamination from the Site has migrated, to ensure that it ceases to present a risk to the public health and the environment." (Pl.Rep.Mem. at 2–3.) The Court entered a temporary restraining order and scheduled a hearing for October 19.

At the hearing on the TRO application, plaintiff sought to enjoin installation of the SVE system and to compel HRC to excavate every centimeter of contaminated soil. At the hearing on the motion, without abandoning its prior request, plaintiff asked "at a minimum" for a mandatory injunction directing HRC to investigate whether there is any groundwater or bedrock contamination, and if so, to remedy the same. Christie also seeks to enjoin HRC from completing installation of the SVE system, sealing the floor, and leasing the Site to a new subtenant.

Plaintiff argues that the injunction is warranted on two grounds. First, it contends that allowing HRC to go forward poses an imminent and substantial danger to the public health and the environment, because HRC's cleanup plan does not include investigation or remediation of possible bedrock or groundwater contamination. Second, plaintiff argues that HRC's installation of the SVE system violates its ground lease from Christie.

## CONCLUSIONS OF LAW

### I. Standards for Preliminary Injunction

■ The award of a preliminary injunction is an extraordinary and drastic remedy that will not be granted absent a clear showing that the plaintiff has met its burden of proof. *See Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 60 (2d Cir. 1985); *Beech–Nut, Inc. v. Warner–Lambert Co.,* 480 F.2d 801, 803 (2d Cir.1973); *Kraft General Foods, Inc. v. Allied Old English, Inc.,* 831 F.Supp. 123, 127 (S.D.N.Y.1993). A party seeking a preliminary injunction must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the

merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor. *See Forest City Daly Housing, Inc. v. Town of North Hempstead,* 175 F.3d 144, 149 (2d Cir.1999). *Accord Statharos v. New York City Taxi & Limousine Comm'n,* 198 F.3d 317, 321 (2d Cir.1999); *Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir.1997); *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir. 1995). "Although this standard does not explicitly mention the public interest ... [the Second Circuit] ha[s] recognized that, as a court of equity, [it] 'may go much further both to give or to withhold relief in furtherance of the public interest than where only private interests are involved.'" *Standard & Poor's Corp., Inc. v. Commodity Exch., Inc.,* 683 F.2d 704, 711 (2d Cir.1982) (quoting *Brown & Williamson Tobacco Corp. v. Engman,* 527 F.2d 1115, 1121 (2d Cir.1975), *cert denied,* 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976)); *see also United States v. Marine Shale Processors,* 81 F.3d 1329, 1359 (5th Cir.1996) (observing the "extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute."). Indeed, there is substantial authority that, when a case is brought pursuant to an environmental or public health statute, including RCRA and the CWA, the primary focus shifts from irreparable harm to concern for the general public interest. *See United States v. Bethlehem Steel Corp.,* 38 F.3d 862, 868 (7th Cir.1994); *United States Env'l Protection Agency v. Environmental Waste Control, Inc.,* 917 F.2d 327, 332 (7th Cir.1990); *Buchholz v. Dayton Int'l Airport,* 1995 WL 811897 (S.D.Ohio, Oct.30, 1995). Nonetheless, the burden rests with the plaintiff to establish that he is entitled to the relief sought. *See Forest City Daly Housing, Inc.,* 175 F.3d at 149. .

The threat of injury must be "actual and imminent," not remote or speculative, and not easily compensated by mone-tary damages. *See Forest City Daly Housing, Inc.,* 175 F.3d at 153 (quoting *Rodriguez v. DeBuono,* 162 F.3d 56, 61 (2d Cir.1998)). The United States Supreme Court has warned, "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. *If such injury is sufficiently likely,* therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Village of Gambell, AK,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987) (emphasis added).

Plaintiff is seeking a mandatory injunction. Such relief is granted sparingly, because mandatory injunctions are more burdensome than prohibitory injunctions, and disturb the status quo prior to final adjudication. *See Tom Doherty Assocs.,* 60 F.3d at 33–34. Thus, the Second Circuit has insisted that to obtain mandatory injunctive relief, a plaintiff must show a clear and substantial likelihood of success on the merits. *See Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996). "[A] mandatory injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty Assocs.,* 60 F.3d at 34 (quoting *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985), *rev'd on other grounds*).

Plaintiff's complaint contains nine causes of action. Despite the fact that the parties discuss the likelihood of success on the merits of all nine claims, only two would arguably support injunctive relief—the Fourth (For Injunctive Relief and Restitution Under RCRA, 42 U.S.C. Section 6872, Against All Defendants) and Tenth (Breach of Contract Against the HRC Defendants). The rest of the claims (including plaintiff's claim under CERCLA) are simply actions for damages, which, by definition, do not raise the spectre of irrepara-

ble injury. Accordingly, I will confine the discussion to the relevant claims.

## II. Plaintiff's RCRA Claim Does not Merit Injunctive Relief

### A. RCRA

The Resource Conservation and Recovery Act, or RCRA, is a comprehensive environmental statute designed to ensure that solid and hazardous wastes are not disposed of in manners harmful to the public health or the environment. *See* 42 U.S.C. § 6902(a). To accomplish these objectives, RCRA regulates the generation, handling, treatment, storage, transportation, and disposal of solid and hazardous wastes. *See* 42 U.S.C. §§ 6922–25. This far-reaching statute establishes what is frequently described as "cradle to grave" oversight. *See Sierra Club v. United States Dept. of Energy*, 770 F.Supp. 578, 579 (D.Colo.1991).

In an effort to secure enforcement of the Act's provisions to the fullest extent possible, Congress conferred enforcement power not only on the EPA or a duly authorized state agency, but also in certain circumstances on affected United States citizens themselves. Under the citizen suit provisions of the RCRA, " 'any person' may commence a civil action on his own behalf" either "against any person ... who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order" effective pursuant to the RCRA, 42 U.S.C. § 6972(a)(1)(A), or "against any person ... who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

■ To prosecute a claim under 42 U.S.C. § 6972(a)(1)(B) successfully, a RCRA plaintiff must ultimately demonstrate that:

(1) the defendant was or is a generator or transporter of solid or hazardous waste or owner or operator of a solid or hazardous waste treatment, storage or disposal facility, (2) the defendant has contributed or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste, as defined by RCRA, and (3) that the solid or hazardous waste in question may pose an imminent and substantial endangerment to health or the environment.

*Prisco v. A & D Carting Corp.*, 168 F.3d 593, 608 (2d Cir.1999).

■ A plaintiff "need not establish 'an incontrovertible "imminent and substantial" harm to health and the environment' " *Orange Env't, Inc. v. County of Orange*, 860 F.Supp. 1003, 1029 (S.D.N.Y.1994) (quoting *Gache v. Harrison*, 813 F.Supp. 1037, 1044 (S.D.N.Y.1993)). As Judge Sweet of this district has said, "[t]he operative word in section 6972(a)(1)(B) is 'may.' " *Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*, 67 F.Supp.2d 302, 310 (S.D.N.Y.1999). Furthermore, "imminency" does not necessarily mean "immediately." The Supreme Court has said that the language of the RCRA " 'implies that there must be a threat which is present now, although the impact of the threat may not be felt until later.' " *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 486, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (*quoting Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir.1994)); *see also Dague v. City of Burlington*, 935 F.2d 1343, 1355 (2d Cir.1991), *rev'd on other grounds*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992);

■ If the Court finds that an imminent and substantial endangerment exists, it has broad equitable powers, and may, "without regard to the amount in controversy or the citizenship of the parties, ... restrain any person who has contributed to the past or present handling, storage, treatment, transportation, or disposal of the solid or hazardous waste" presenting

the threat to health or the environment. 42 U.S.C. § 6972(a). Both prohibitory and mandatory injunctions may properly be issued under this provision. *See Meghrig*, 516 U.S. at 483–84, 116 S.Ct. 1251 at 1254, 134 L.Ed.2d 121.

 Notwithstanding the broad powers of RCRA's citizen suit provision, the commencement of a RCRA suit does not automatically warrant entry of an injunction. Only if injury is "sufficiently likely" will the balance of harm tilt in favor of injunctive relief. *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987). Courts will not find that an imminent and substantial endangerment exists "if the risk of harm is remote in time, completely speculative in nature, or de minimis in degree." *United States v. Reilly Tar & Chem. Corp.*, 546 F.Supp. 1100, 1109 (D.Minn.1982).

### B. *Plaintiff is not likely to succeed on the merits of its RCRA claim*

 Defendants do not dispute that hazardous chemicals were released at the site, or that HRC and its sub-tenant, Mimi Cleaners, contributed to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste, as defined by RCRA. However, they contend that plaintiffs are not likely to succeed in proving that the planned cleanup, and the decision not to investigate the bedrock or groundwater for contamination at this time, poses an imminent and substantial endangerment to health or the environment. I agree.

In most cases brought under the RCRA, plaintiffs want to force site owners and operators to *begin* a cleanup (or stop dumping and begin a cleanup). In such cases, courts will look at the level of environmental damage and the impact of waiting to begin a cleanup. *See Prisco v. State of New York*, 902 F.Supp. 374, 394–95 (S.D.N.Y.1995), *Wilson v. Amoco Corp.*, 989 F.Supp. 1159 (D.Wyo.1998), Foster v. U.S., 922 F.Supp. 642, 661 (D.D.C.1996).

Here, Christie wants me to declare that the clean-up mechanism chosen by HRC and approved by the DEC for use at the Site poses an imminent and substantial danger because it will not adequately clean the remaining soil, or bedrock or groundwater contamination, if there is any. I cannot make such a finding because HRC's installation of an SVE system does not pose a danger to the environment.

HRC's current plan is to cleanup the soil underneath the Site and the surrounding areas using SVE. SVE is a DEC approved remedy for the type of contamination found at this site, especially given the sandy soil conditions. DEC has approved the use of SVE in theory for the Site, subject to additional DEC and DOH health and safety requirements. The SVE system and the overall cleanup effort will remain subject to continued oversight by DEC and other regulatory agencies. The agreement between HRC and the DEC allows for this very possibility. (Savarese Decl. at Exh. D at 4, 6.) If DEC is not satisfied with the results of defendant's SVE measures, it retains the right to insist on additional measures. Assuming, *arguendo*, that further remediation is required, installation of the SVE system *cannot hurt*; in fact, it can only help.

The DEC is not currently requiring any additional measures beyond the SVE, nor have plaintiffs presented any evidence that further remediation measures are necessary. However, in approving the use of the SVE system under the Work Plan, the DEC stated that it "may also require further investigation of impacts to groundwater quality, including groundwater sampling, toward fulfillment [sic] of the requirement under the voluntary cleanup program of exposure assessment for off-site contamination." (Williams Aff. at Exh. C.) Notwithstanding the "voluntary" nature of this cleanup, HRC is *required* to reduce the contamination to a level that the DEC believes is safe. I have seen no evidence that HRC is refusing or will refuse to comply with these objectives. On

the contrary, it is being extraordinarily pro-active and cooperating fully with state environmental authorities.

Plaintiff's original objective in bringing this action was to obtain an order directing removal of all contaminated soil under its building. But there is a very real danger that defendant cannot further remediate the site by taking out more soil. HRC has removed 72 tons of soil already. LMS, its engineers, have opined that another 450 tons might have to be excavated, and have raised the significant possibility that further excavation will undermine the foundation of the building or of adjacent buildings (since some of the soil is likely off site). Plaintiff does not dispute this with any competent evidence. SVE, by contrast, will improve the soil conditions over time, not only under the subject property, but under adjacent streets and buildings as well, by literally pulling contaminant out of the soil. The fact that the site will be covered by a concrete slab while the process is carried out means that no noxious vapors will injure human health.

Plaintiff argues that, because defendant has "repeatedly declined" its requests to "investigate and remediate bedrock and groundwater contamination," it has no assurances HRC will take such action in the future. (Pl.Rep.Mem at 3–4.) Aside from its comments to the original voluntary cleanup agreement, Christie made one written request to HRC on October 5. It did not insist on an "investigation" of possible bedrock or groundwater contamination, as claimed at the hearing, but on "a total cleanup of its property, with no residual contamination," and a "complete removal of all contaminated soil, bedrock and other material." (Gerrard Aff. at Exh. E.). That DEC did not incorporate plaintiff's suggestions into the work plan does not show that defendant would be unwilling to remediate if there were evidence of bedrock or groundwater contamination.

At present, there is no such evidence. Plaintiff claims to have provided ample evidence of likely bedrock and groundwater contamination, but in fact they offer none at all.

First, Christie says, defendant's engineer noted the possibility of bedrock infiltration in his first letter to HRC, when LMS was proposing its services to defendant in July 1999. But that letter was written before LMS had even examined the Site. The bedrock could not even be seen. The firm was simply enumerating for its client the universe of possibilities. (Pease Tr. at 65–66.) This is not evidence that contamination in fact exists.

Second, plaintiff points to bedrock infiltration and groundwater contamination in the spill site across the street at a former Mobil station. They appear to argue that this fact suggests porous bedrock, and a similar situation under 58 Christie Place. But, as noted above, there are substantial differences in the two sites. Mobil placed gas storage tanks in the bedrock—necessitating considerable blasting and disturbing of the bedrock, given its subsurface level as testified to by Dr. Pease (See Tr. at 50–51). Moreover, the gasoline was leaking *directly into the bedrock* at the Mobil Site. There is no evidence at all that the bedrock was similarly disturbed at 58 Christie Place (and plaintiff, as owner of the building, could presumably have produced some evidence if it had been). Visual inspection of the bedrock by LMS revealed no fissures, and Chazen (on whose report plaintiff relies extensively) opined that the bedrock was acting as a barrier to migration of chemicals under Mimi Cleaners.

Plaintiff argues that both DEC and HRC have raised the possibility of future investigations of the bedrock or groundwater, and notes (correctly) that hairline cracks would not necessarily be visible to the naked eye. However, DEC has indicated that it will continue to monitor the clean-up, and may require bedrock or water testing if it seems appropriate. That DEC does not see the need for such testing now is powerfully persuasive to the

Court of the lack of any need for judicial interference.

Plaintiff cites as support *Wilson v. Amoco Corp.,* 989 F.Supp. 1159 (D.Wyo.1998), where the court issued a mandatory injunction against some of the defendants. However, that case actually supports defendant's position.

In *Wilson,* the court granted an injunction against the Amoco defendants, in light of clear evidence of massive contamination and great danger to the public. At the Amoco sites, the court found "ample documentation of the operating conditions and practices at the Refinery and Tank Farm," and a "high level of employee concern" about Refinery infrastructure. *Id.* at 1164. There was substantial evidence that contamination had migrated off-site, into an area *three times* the size of the Exxon Valdez oil spill. In addition, the EPA had conducted "little investigation of any worth" and Amoco's response to regulatory requests was "inadequate." *Id.* Finally, there was significant evidence that contamination was continuing to elude capture by poorly-functioning wells. *See id.* at 1176. The court therefore granted an injunction against Amoco.

Of greater significance for our case, there was another defendant in *Wilson* who ran a dry-cleaning facility in the same town as the Amoco sites. There was evidence in the record that 63,000 to 230,000 gallons of PCE-contaminated water was discharging each day into the North Platte River. *See id.* Plaintiffs also presented evidence by a former employee of the dry cleaner defendant, who had witnessed PCE flow through a hose and into a floor drain. This employee observed that the indoor spills were swept out through the facility doors into the parking lot. *See id.* at 1169. Another employee recalled cleaning the "button trap," a component of the dry cleaning machine through which PCE flowed, by hosing it off into troughs that flowed into the sewer. *See id.* at 1167.

Nonetheless, the Wilson court refused to grant a mandatory preliminary injunction requiring defendant to contain the discharges and remediate the contaminated property on the grounds that it was premature to order the defendant dry cleaner to clean up the contamination without further evidence of that defendant's sole responsibility (an engineering and environmental report identified 17 potential sources of the contamination attributed by plaintiffs to defendant). *See id.* at 1180. The court also stated:

> In addition to their myriad of causation hurdles, Plaintiffs face the equally troublesome problem of demonstrating that the PCE contamination poses an imminent and substantial endangerment to health and the environment. The evidence before the court casts doubts on the plaintiff's assertion that it does.

*Id.* at 1180–81.

I understand that plaintiff wants defendant to test for bedrock and groundwater contamination, and that it must only show the possibility of such contamination. However, plaintiff has not provided me with any evidence, let alone compelling evidence, that there is a real possibility of such contamination, such that immediate testing is necessary and should be ordered *pendente lite* . There is no evidence at all about Mimi's operation before this Court, and they have ceased in any event. This is a radical difference from *Wilson,* where there was significant evidence of ongoing pollution by the dry cleaner. If no injunction issued in that case, I fail to see how one could be warranted here.

HRC's current remediation plan poses no danger to human health. Prior to beginning *any* remedial measures, the level of contamination was still below EPA ranges for the protection of human health. As LMS scientist and day-to-day supervisor of this Site's cleanup Bradley C. Williams, Ph.D., P.E., warns: "whether contamination is present in bedrock or groundwater is secondary to the immediate concern that the only potential human exposure pathway (ambient air) be elimi-

nated." (Williams Aff. ¶ 22.) The court credits the affirmation of defendant's expert, Thomas Pease, Ph.D., P.E., that "the existing PCE contamination does not present a human health threat because there is no exposure pathway from the contaminated soil to a receptor, and groundwater is not used as a drinking water supply in the vicinity of the Site." (Pease Aff. ¶ 19.) Moreover, any inchoate threat is best eliminated by using SVE rather than by further disturbance of the soil—which poses some risk of undermining the structural integrity of the main commercial area of Scarsdale.

Insofar as the bedrock and groundwater are concerned, it seems clear, after listening to testimony at the hearing, that at a minimum the SVE will not harm these strata. It would actually improve any groundwater above the bedrock (by sucking out the vapors released by dissolved chemicals as groundwater-dampened soil dries) and could act as a brake on further leaching of PCE's into the bedrock should any be occurring. (Pease Tr. At 79.) It is true that SVE is highly unlikely to have a significant impact on chemicals that are already in or below the bedrock, but there is simply no evidence in this record from which I can conclude that any are.[3]

Thus, plaintiff has not come close to demonstrating a likelihood of success on the merits of its RCRA claim. Indeed, it has not even come close to making the showing that was deemed insufficient to warrant an injunction against the dry cleaner in Wilson. This alone is reason to deny the motion.

### C. *Plaintiff has not shown irreparable injury on its RCRA claim*

■ To establish irreparable harm, plaintiff must demonstrate "an injury that is neither remote nor speculative, but actual and imminent." *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975

(2d Cir.1989). Additionally, the injury must be one "not capable of being fully remedied by money damages." *NAACP v. Town of East Haven,* 70 F.3d 219, 224 (2d Cir.1995) (citing *Tucker,* 888 F.2d at 975). The threat of irreparable harm is a sine qua non for granting preliminary injunctive relief. *See Buffalo Forge Co. v. Ampco–Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir.1981). "[I]f there is no irreparable injury, there can be no preliminary injunction." *Markowitz Jewelry Co. v. Chapal/Zenray, Inc.,* 988 F.Supp. 404, 406 (S.D.N.Y.1997).

■ As discussed above, when a case is brought pursuant to an environmental or health statute, the focus of the irreparable harm inquiry shifts to concern for the public interest. *See Wilson,* 989 F.Supp. at 1171. In a RCRA case, the irreparable injury prong of the inquiry effectively merges with the court's analysis of plaintiff's likelihood of success on the merits. This court has determined that plaintiff will likely not be able to prove an imminent and substantial threat to public health or the environment if defendant is allowed to proceed with the current cleanup plan. Because the danger is *de minimis* or nonexistent, there is no danger to the public interest for the purposes of irreparable injury.

Nevertheless, it is worth reiterating that the public interest clearly favors denial of this motion. Enjoining installation of the SVE system only delays remediation of the additional soil contamination found by HRC during the cleanup. I also attribute significant importance to defendant's claim that the SVE system "will provide continual protection against potential PCE contamination of the air located inside the former Mimi Cleaners, the primary human exposure pathway, by preventing the migration of contaminated vapors present below the building into the retail spaces."

---

**3.** The parties have not even begun to address issues of causation of any groundwater contamination, which, given the proximity of the

Mobil Site and a major Metro North station, loom large.

(Def.Mem.¶ 11) Compelling the excavation of additional soil creates an engineering hazard that endangers the public using the area and adjacent tenants (who include the U.S. Postal Service). On the evidence before me, it also carries the very real possibility of a less effective cleanup.

### III. Plaintiff's breach of lease claim does not merit injunctive relief

Plaintiff requests the same mandatory injunctive remedy under its pendent state law claim for breach of the ground lease. Plaintiff argues that defendant is in violation of two provisions in the lease. The first, Article Four, requires that defendants comply with all applicable laws and regulations. The second, Article 23, requires the lessee to secure the lessor's consent for "alterations" costing in excess of $1,000, and the lessor can not unreasonably withhold its consent.

The court acknowledges that New York law permits an injunction to forestall the making of an unauthorized alteration to leased premises, or to remove same, as long as the traditional criteria for injunctive relief are met—that is, plaintiff is likely to succeed on the merits and will be irreparably injured in the event no injunction issues, and the equities balance in plaintiff's favor. *See McDonald v. O'Hara*, 192 N.Y.S. 545, 548, 117 Misc. 517, 523 (1921); *209–13 West 48th Realty Corp. v. Rose Offset Printing Corp.*, 74 N.Y.S.2d 216 (Sup.Ct.1947). However, no injunction can issue here, because plaintiff meets none of those criteria.

#### A. *Plaintiff is not likely to prevail on the merits of its breach of lease claim*

Turning first to likelihood of success on the merits, I first hold that the installation of the proposed SVE system is not an alteration, as that term is understood in New York law. An alteration is an improvement that changes the nature and character of the demised premises so as to impinge on the landlord's reversionary estate. *See Garland v. Titan W. Assocs.*, 147 A.D.2d 304, 543 N.Y.S.2d 56, 60 (1st Dep't.1989); *Harar Realty Corp. v. Michlin & Hill, Inc.*, 86 A.D.2d 182, 449 N.Y.S.2d 213 (1st Dep't.1982).

The proposed SVE system is anything but an alteration. That a system of this nature does not change the nature and character of the premises is well settled. In *Frequency Elec., Inc. v. We're Assocs. Co.*, 120 A.D.2d 489, 501 N.Y.S.2d 693, 694 (2d Dep't.1986), the court found that defendant lessee did not breach a lease provision similar to the present provision when defendant installed a ventilation system, because the system was "readily removable" would not injure plaintiff's reversion. If a ventilation system within leased premises is not deemed an alteration, then a vapor extraction system *under* the leased premises, which has no impact whatever on the nature and character of the premises themselves, can hardly be deemed an alteration.

There is a second reason why plaintiff is unlikely to prevail. In New York, a tenant is at liberty to erect structures to enable it to carry on its business. *See Garland*, 147 A.D.2d 304, 543 N.Y.S.2d at 60; *Harar Realty Corp.*, 86 A.D.2d 182, 449 N.Y.S.2d 213; *N. & S. Decor Fixture Co., Inc. v. V.J. Enters., Inc.*, 57 A.D.2d 890, 394 N.Y.S.2d 278, 279 (2d Dep't.1977) Here, the business of HRC is leasing stores for commercial purposes. The presence of contaminants in and below the premises has a deleterious impact on the ability to rent the premises, and the ability of the tenant to use them safely for commercial purposes.

Finally, plaintiff is unlikely to prevail on the merits of its claim that HRC is in violation of the sections of the lease that require it to comply with all applicable laws, because there is no evidence that HRC is *not* complying with all applicable laws. To the contrary, what the evidence shows is that HRC is working hand in glove with State health and environmental

authorities to bring the premises into compliance with the most stringent of DEC's multi-layered environmental regulations. The lease does not entitle plaintiff to dictate what remedial measures HRC will use to clean up the Site—it only entitles plaintiff to a Site that complies with the law. Notably, the law does not require a completely clean Site—just one that complies with DEC minimal emissions standards. As long as HRC achieves that goal, there is no waste.

### B. *Plaintiff has not shown irreparable harm*

■ Plaintiff has also not established that it will be irreparably injured absent an injunction against this installation. Christie–Spencer has not introduced a scintilla of evidence of how the extraction of noxious chemicals under the supervision of the DEC impairs the value of the reversion. Frankly, the proposition is too counterintuitive to warrant further comment. To the extent that plaintiff does not like the idea of having an SVE system under its building, defendant clearly understands that it will have to reopen the floor and take it up, at its own expense, prior to returning the premises to the owner. And to the extent plaintiff fears that it will someday be responsible for further cleanup costs, it has an adequate remedy at law against HRC under both CERCLA and RCRA, as well as the common law.

### C. *The balance of the equities favors the defendant*

■ Finally, the balance of the equities tilts heavily in favor of the defendant. To the extent plaintiff seeks to stop installation of the SVE system, there are no equities on its side at all, since there is no demonstrable harm from the system and defendant needs to do something to redress its tenant's spill, not only to bring it into compliance with the law but also to bring it into compliance with the lease. To the extent plaintiff seeks to compel defendant to excavate rather than rely on SVE, there are no equities on its side, since the only competent evidence in the record (that is, from an engineer) suggests that significant further excavation would endanger the integrity of the structure and adjacent structures—an intolerable risk. And to the extent that plaintiff believes it is entitled under the lease to force further investigation, it cites no controlling lease provision and no evidence that further investigation is necessary—especially in the face of DEC's continuing oversight of the project.

## CONCLUSION

For the reasons expressed above, Plaintiff's request for a preliminary injunction is denied and the temporary restraining order is dissolved.