**HUDSON RIVERKEEPER FUND, INC., Plaintiff,**

and

**Village Of Hastings–On–Hudson, Plaintiff–Intervenor,**

v.

**ATLANTIC RICHFIELD COMPANY, Defendant, Third–Party Plaintiff,**

v.

**United States of America, the United States Department of Defense, the United States Department of Commerce and the United States Navy, Third–Party Defendants.**

No. 94 CIV 2741 (WCC).

United States District Court, S.D. New York.

March 30, 2001.

Pace Environmental Litigation Clinic, Inc., (Karl S. Coplan, Bernard Kelly, Robert Varga, TCDD A. Frampton, Jeffrey M. Casaletto, of counsel), White Plains, New York, for Hudson Riverkeeper Fund, Inc.

Sive, Paget & Riesel, P.C. (Mark A. Chertok, Steven C. Russo, Annmarie M. Terraciano, of counsel), New York City, for Village of Hastings-on-Hudson.

Sidley & Austin, New York City (Katherine L. Adams, of counsel), Arnold & Porter, Washington, D.C. (Thomas H. Milch, Michael D. Daneker, of counsel), for Atlantic Richfield Company.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Hudson Riverkeeper Fund, Inc. ("Riverkeeper") and Plaintiff–Intervenor Village of Hastings–on–Hudson ("Village") (collectively, "plaintiffs") bring this environmental action against defendant Atlantic Richfield Company ("ARCO") under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.*, alleging that ARCO, corporate successor to Anaconda Wire & Cable Company ("Anaconda"), is liable for contamination of the Hudson River (the "Hudson") allegedly caused by Anaconda while manufacturing electrical cable on land adjacent to the Hudson. Plaintiffs now move for summary judgment pursuant to FED. R. CIV. P. 56, seeking a declaration of ARCO's liability to remedy the alleged contamination. For the reasons stated below, plaintiffs' motion is denied.

### BACKGROUND

From approximately 1919 until 1975, Anaconda operated an electrical cable manufacturing facility on a site located at 1

River Road, Hastings–on–Hudson, New York, along the east bank of the Hudson (the "Site"), where it made copper wire and cable, bare and insulated and/or sheathed. Beginning in the late–1930's, polychlorinated biphenyl ("PCB") mixtures (commercially known as "Aroclor") were used to impregnate paper- and asbestos-wrapped cable before the outer sheathing was applied. The PCB mixtures were prepared and the wrappings were impregnated in various buildings on the Site.

During and around World War II, from approximately 1940 to 1947, the United States government (the "U.S.") allegedly directed Anaconda to manufacture at the Site PCB-insulated cable for military use. (Def. Am.3d-Party Complt. ¶¶ 8, 15.) ARCO claims that the U.S. virtually controlled all operations at the Site, owned some of the manufacturing equipment, purchased the raw materials used and "arranged for the disposal of wastes containing PCBs at the Site." (Id. ¶ 9.)

Anaconda closed the Site in 1975. In 1977, Anaconda was merged into a wholly-owned subsidiary of ARCO, which in 1981 was merged into ARCO, who assumed all of the subsidiary's liabilities. In the 1980's and 1990's, the Site was owned by several developers who tried unsuccessfully to redevelop the property.[1] In 1998, ARCO Environmental Remediation, L.L.C. ("AERL") purchased the Site and remains its present owner. AERL is a subsidiary of CH–Twenty, a privately held corporation owned in part by ARCO and in part by an independent third party. (Brekhus Aff. ¶ 8.) ARCO states that AERL is merely an affiliate of ARCO.

Riverkeeper brought the instant action in April 1994, and the Village was allowed to intervene on June 9, 1994 by order of the late Honorable Vincent L. Broderick, from whom this Court inherited the case.[2] Because the New York State Departments of Environmental Conservation ("DEC") and Health ("DOH") began investigating the Site, we placed the case on the Suspense docket on May 12, 1995 pending issuance of the investigatory findings. The Court received biannual status reports from the parties through July 1999, but since the DEC had not completed its report and recommendation by then, and was not expected to do so within a limited time thereafter, we reinstated the case to the active docket on October 4, 1999.

## DISCUSSION

Plaintiffs now move for summary judgment pursuant to FED. R. CIV. P. 56. They allege that as a result of Anaconda's manufacturing and disposal practices, the Site "may present an imminent and substantial endangerment to health or the environment," 42 U.S.C. § 6972(a)(1)(B), and that ARCO, as corporate successor to Anaconda, is liable for all of Anaconda's past

1. ARCO's ownership of the Site apparently ended in September 1988, when developer Harbor at Hastings purchased the Site. (See Def. Rule 56.1 Counter–Stmt. ¶ 11.)

2. ARCO argues that the Village's failure to file a timely letter of intent to sue pursuant to 42 U.S.C. § 6972(b)(2)(A) precludes it from joining in the instant action. However, Judge Broderick allowed the Village to intervene under 42 U.S.C. § 6972(b)(2)(E), which provides in relevant part that "any person may intervene as a matter of right when the applicant claims an interest relating to the subject matter of the action and he is so situated that the disposition of the action may ... impair or impede his ability to protect that interest." Since the Site is located within Hastings–on–Hudson itself, the Village clearly has an interest in environmental actions such as this one, which may affect, inter alia, the health of its residents and/or their property values. Moreover, since a negative outcome in the instant action could preclude the Village from pursuing its own interests, it was properly granted intervention under RCRA.

actions that caused or contributed to any contamination of the Hudson. ARCO argues that the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601, *et seq.*, preempts the RCRA claim. Alternatively, ARCO argues that because AERL, the present owner of the site, is merely an affiliate of ARCO, AERL is actually liable for any remediation that must occur and that plaintiffs have not causally linked the alleged river contamination to Anaconda. Finally, ARCO contends that the evidence does not show that an "imminent and substantial endangerment" exists.

## I. *Summary Judgment Standard*

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, the court should resolve all ambiguities and draw all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide genuine issues of material fact, but to discern whether any exist. *See Gallo v.*

*Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994). Summary judgment may not be granted simply because the court believes the nonmovant will not be able to meet the burden of persuasion at trial. *Danzer v. Norden Sys.,* 151 F.3d 50, 54 (2d Cir.1998).

## II. *Standing*

■ As an initial matter, we find that because its "members include commercial and recreational fishermen whose commercial and recreational interests have been [allegedly] injured because of PCB contamination of fish in the Hudson," (Riverkeeper Mem. Supp. Summ. J. at 6), and because the Village "has an interest … protect[ing] the health and welfare of Hastings residents," (Village Rule 56.1 Stmt. ¶ 6), plaintiffs have standing to bring the instant action.

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc., v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Furthermore, the Supreme Court has established a low causation threshold, stating that a "substantial likelihood" that defendant's actions caused plaintiff's harm confers standing. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Riverkeeper avers that its members' use and

enjoyment of the Hudson has been affected by Anaconda's manufacturing and disposal practices. Similarly, the Village alleges that its property values have been adversely affected by the Site, and that it has lost millions of dollars in tax revenue on the Site due its contamination. (*See* Kinnally Aff. ¶¶ 20–22.) Thus, Riverkeeper's members and the Village's residents have suffered an injury in fact that is fairly traceable to Anaconda, which can be "redressed by a favorable decision" from this Court. Therefore, both Riverkeeper and the Village have constitutional standing to sue ARCO.

■ *Riverkeeper has organizational standing to bring the instant action.*

An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue on their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.

*Laidlaw*, 528 U.S. at 181, 120 S.Ct. 693 (citing *Hunt v. Washington Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). Riverkeeper satisfies *Hunt*'s requirements because: (1) its members have standing to sue on their own (*see* Gabrielson Aff. ¶ 8); (2) the environmental protective relief sought in the suit is germane to Riverkeeper's organizational purpose (*see* Boyle Aff. ¶ 2); and (3) Riverkeeper's suit does not require the participation of its individual members. The Village, a municipal corporation, does not require organizational standing. *See, e.g., Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 110–12, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (finding that municipal entity has standing to sue where defendant's actions have impaired important municipal functions). We find, therefore,

that plaintiffs have standing to bring the present suit.

### III. *TSCA Preemption*

■ ARCO argues that "[b]ecause PCBs are not hazardous wastes, RCRA claims for PCB contamination are preempted by the provisions of [TSCA], 15 U.S.C. § 2601, *et seq.*, specifically created to deal with PCB storage and disposal." (Def. Mem. Opp. Summ. J. at 40.) This argument fails for two reasons. First, TSCA is regulatory in nature, "controlling the disposal, manufacturing, handling and storage of a chemical such as PCB" (Riverkeeper Reply Mem. Supp. Summ. J. at 10), and primarily applying to suits brought by the EPA Administrator on behalf of the government. *See, e.g., United States v. Burns*, 512 F.Supp. 916, 918 (W.D.Pa. 1981). In contrast, the instant suit is a citizen remedial action, so TSCA does not apply. Second, even if the suit were regulatory, RCRA does not list TSCA among the regulatory acts with which it is integrated. *See* 42 U.S.C. § 6905(b). Therefore, plaintiffs' RCRA claims are not preempted by TSCA.

### IV. *ARCO's Corporate Liability*

■ ARCO next argues that because AERL, ARCO's affiliate, presently owns the Site, general rules of corporation law render AERL—not ARCO—liable for any remediation that may be required. (*See* Def. Mem. Opp. Summ. J. at 44 (citing *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiaries.")).) This argument is of no avail. A RCRA citizen suit may be brought against

> any person ... including any ... past or present owner or operator of a treatment, storage, or disposal facility, who

has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B). ARCO admits that it is the successor to Anaconda, having assumed all of its liabilities when it merged Anaconda into itself in 1981. (*See* Def. Rule 56.1 Counter–Stmt. ¶ 11.) Therefore, ARCO is just as responsible as Anaconda itself, and AERL's corporate relationship to ARCO is irrelevant. For the purposes of RCRA, "[b]y virtue of its acquisition of ... Anaconda ... ARCO is one of the former owners of the Site." (Golder Associates 1996 Remedial Investigation ("RI"), § 2.2 at 4.) We therefore conclude that ARCO is liable for any of Anaconda's actions that may have contaminated the Site.

## V. *Causation*

■ ARCO also argues that plaintiffs have not shown that Anaconda, "rather than another prior occupant[3] of the Site, contributed to the disposal of the PCBs." (Def. Mem. Opp. Summ. J. at 41.) "The term 'contributed to' is not defined under RCRA, so courts have looked to its ordinary meaning.... The term has been universally held to infer something more than mere ownership of a site; some level of causation between the contamination and the party to be held liable must be established." *Delaney v. Town of Carmel*, 55 F.Supp.2d 237, 256 (S.D.N.Y.1999) (citations omitted). ARCO contends that

in a case such as this where a reasonable inference could be drawn that more than one party could be responsible for con-

tamination presently posing a threat, Riverkeeper has two options. It can establish a causal link to one defendant through admissible factual evidence, or join all possible defendants and pursue an alternative liability theory.... It has done neither.

(Def. Mem. Opp. Summ. J. at 40 (citing *Aurora Nat'l Bank v. Tri Star Mktg., Inc.*, 990 F.Supp. 1020, 1035 (N.D.Ill.1998); *Zands v. Nelson*, 797 F.Supp. 805, 810–11, 817–18 (S.D.Cal.1992)).)

ARCO's argument fails for two reasons. First, alternative liability is not the law of this Circuit. Instead, plaintiffs must prove that "particular defendants' waste was *of a type* that could contribute to an imminent and substantial endangerment to health or the environment that may exist." *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 609 (2d Cir.1999) (emphasis added). ARCO's own documents show that PCBs were mixed and used in Anaconda's daily operations and that Aroclor 1260, the active PCB agent used in Anaconda's cable-impregnating process, was stored on the Site. (*See* RI § 2.2 at 4, Table 2–1; Def. Am.3d-Party Complt. ¶ 43 at 11–12.) Sediment samples taken from the Hudson immediately adjacent the Site contain Aroclor 1260. (*See* Excerpts of August 1998 Supplemental Sampling, Table 3–8; Excerpts from River Sediment Analysis, November 1998.) Thus, plaintiffs have established "*some level* of causation between the contamination and the party to be held liable." *Delaney*, 55 F.Supp.2d at 256 (emphasis added).

Secondly, ARCO has presented no evidence that Universal Voltronics—who is not a named defendant in this action—actually disposed of or leaked PCBs at the Site. Moreover, ARCO, merely citing the

---

**3.** In addition to the U.S., ARCO points to Universal Voltronics, a Site lessee in the 1980s who manufactured high-voltage electri- cal transformers that allegedly contained PCBs (*see* RI § 2.2 at 5; Maher Dep. at 481), as a possible Site contaminator.

allegations contained in its third-party complaint against the U.S., has not offered enough evidence of the U.S.'s alleged involvement in Site operations in the 1940s to absolve itself from liability. Despite our resolving all factual inferences in its favor, to defeat summary judgment as the nonmovant, ARCO must go beyond its own pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348.[4] This it has not done. Therefore, ARCO cannot escape liability by shifting the blame to the U.S. or Universal Voltronics. We find that plaintiffs have established the necessary causation to render ARCO liable for Anaconda's industrial practices.

## VI. *Imminent and Substantial Endangerment*

Plaintiffs argue that the scientific evidence contained in New York State investigation summaries, their experts' reports and ARCO's own documents show that the alleged PCB contamination at the Site "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). To prevail under RCRA, plaintiffs "need not establish 'an incontrovertible imminent and substantial harm to health and the environment.'" *Christie–Spencer Corp. v. Hausman Realty Co.*, 118 F.Supp.2d 408, 419 (S.D.N.Y.2000) (quoting *Orange Env't, Inc. v. County of Orange*, 860 F.Supp. 1003, 1029 (S.D.N.Y.1994)). "The operative word in section 6972(a)(1)(B) is 'may.'" *Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*, 67 F.Supp.2d 302, 310 (S.D.N.Y.1999). "Furthermore, 'imminency' does not necessarily mean 'immediately.' The Supreme Court has said that RCRA 'implies that there must be a threat which is present now, although the impact of the threat may not be felt until later.'" *Christie–Spencer*, 118 F.Supp.2d at 419 (quoting *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 486, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996)) (internal citation omitted). Moreover, as Judge McMahon points out,

> [i]n most cases brought under the RCRA, plaintiffs want to force site owners and operators to *begin* a cleanup (or stop dumping and begin a cleanup). In such cases, courts will look at the level of environmental damage and the impact of waiting to begin a cleanup.

*Christie–Spencer*, 118 F.Supp.2d at 420 (citations omitted).

Nonetheless, as ARCO argues, despite the broad construction the Supreme Court has given the word "may," summary judgment on a RCRA claim is infrequently granted. In fact, plaintiffs cite only one case in this Circuit granting summary judgment in the last decade. *See Connecticut Coastal Fishermen's Assoc. v. Remington Arms Co.*, 989 F.2d 1305 (2d Cir. 1993). Moreover, where, as here, there are conflicting expert reports presented, courts are wary of granting summary judgment. *See, e.g., Kara Holding Corp.*, 67 F.Supp.2d at 312 (denying summary judgment is "appropriate in the face of the conflict in expert testimony"); *Orange Env't*, 860 F.Supp. at 1028–29 (denying summary judgment "in light of the disputes between the various experts as to the effect of [the contamination] on ... health and environment"); *Gache v. Town of Harrison*, 813 F.Supp. 1037, 1042–43 (S.D.N.Y.1993) (denying summary judgment when conflicting expert reports showed that a "landfill's present threat to the surrounding environment, a fact mate-

---

**4.** Although ARCO's third-party claim against the U.S. may uncover facts that strengthen its causation argument, that claim is still in discovery as of this writing.

rial to plaintiff's claim of a continuing violation of RCRA, is disputed").

Plaintiffs argue that the chain of events is as follows: (1) soil at the Site was contaminated with PCBs from Anaconda's manufacturing processes; (2) soil and groundwater contaminated by it was carried into the Hudson immediately adjacent the Site via rainwater and tidal flows; (3) the soil settled in the riverbed sediment; (4) striped bass swimming in the Hudson adjacent the Site became contaminated; (5) PCBs have bioaccumulated in the tissues of the striped bass; and (6) humans and mink are potentially harmed because they may eat the striped bass.[5] ARCO concedes that "on-Site soils in five limited areas of the property and some offshore River sediments ... contain ... PCBs." (Def. Mem. Opp. Summ. J. at 6.)[6] Thus, we will focus on the latter three parts of plaintiffs' argument.

### A. *Striped Bass*

#### 1. *Fish Contamination*

Plaintiffs rely on a 1998 DEC fish tissue analysis ("DEC FTA") and the expert report of Ralph Huddleston ("Huddleston Report") in arguing that the Site presents an imminent and substantial endangerment to the striped bass population in the Hudson. The DEC FTA found "a clear localized impact [on collected striped bass samples] from site-related PCBs." (DEC FTA at 2.) From the data contained in the DEC FTA, and based on his own methodology, Huddleston concluded that "[t]he toxicity quotient for striped bass taken from [sic] adjacent to site is 2.2. This value is greater than 1.0 and therefore represents a risk to striped bass." (Huddleston Report at 16, § 7.2.)

ARCO's experts dispute both the DEC's and Huddleston's findings. The expert report of Dr. Kenneth D. Jenkins ("Jenkins Report") finds that the DEC failed to follow its own protocol when it combined all the collected fish samples into one composite sample instead of collecting three unique samples. (Jenkins Report at 6–7.) Jenkins concludes that because "[a] single PCB measurement taken at one point in time does not provide an adequate basis for characterizing the concentrations of PCBs in populations in juvenile striped bass ... adjacent to the Site" (*id.* at 7), Huddleston's conclusions were flawed.

---

**5.** Plaintiffs argue that "PCBs travel via uptake of surface water ingestion, sediment ingestion, and/or food." (Riverkeeper Mem. Supp. Summ. J. at 6.) However, because: (1) "[a]n estimated 90% of the [Site] is covered by asphalt paving and buildings," (DEC ⅜ Proposed Remedial Action Plan ("PRAP"), at § 2); (2) the Site is fenced off and patrolled by a security service (*see* Brekhus Aff. ¶ 19); (3) "the areas where PCBs were found in the sediment generally are not areas of the [Hudson] conducive to swimming or wading" (Expert Report of Dr. John Whysner ("Whysner Report") at 7, ¶ 12); and (4) "[s]ince potable drinking water is supplied to the site by a public drinking water supply system" (PRAP at § 4.3), we find that humans are not likely to be affected by direct contact with any potentially contaminated water, soil or sediment.

**6.** Despite this concession, ARCO contends that because both it and AERL have implemented "measures approved by DEC and DOH ... to eliminate any potential risks pending final remediation," and because "the highest levels of PCB contamination on Site are not at the surface (*see* PRAP § 4.1.2)," "Site conditions · are actually improving." (Def. Mem. Opp. Summ. J. at 4.) Plaintiffs vigorously dispute ARCO's reasoning. (*See* Riverkeeper Reply Mem. Supp. Summ. J. at 3, n. 3; Village Reply Mem. Supp. Summ. J. at 3). Nonetheless, because the PRAP contemporaneously notes both the extent of the Site soil contamination (*see* PRAP § 4.1.2) and the measures ARCO and AERL have taken to improve it (*see id.* § 4.2), a genuine issue of fact exists as to the extent of the Site's present contamination.

The expert report of Dr. Douglas G. Heimbuch ("Heimbuch Report") also disputes the DEC's findings.

Heimbuch found the same methodology flaw in the DEC's composite sample as Jenkins did. (*See* Heimbuch Report at 1–2.) He also found that because the DEC collected juvenile instead of adult samples, the potential hazards of the PCB concentrations found were misrepresented. He concludes that because the PCB concentration in adult striped bass is much more diluted than in juveniles, "an initial PCB concentration of 6.9 ppm [the DEC finding] in early September would be expected to drop to 0.012 ppm ... by the time the striped bass reached 18", and drop to 0.0053 ppm ... by the time the striped bass reached 24", due to the effects of growth. (*Id.* at 3.) Thus, in light of the conflicting expert opinions, a genuine issue of material fact exists as to whether PCBs adjacent the Site present an imminent and substantial endangerment to striped bass.

### 2. *Human Endangerment*

Heimbuch also notes that, "the minimum sizes of striped bass harvested are 18" for fish caught in the Hudson river and 24" for fish caught in the ocean." (*Id.*) Moreover, it is illegal for humans to consume juvenile striped bass. (*See* Whysner Report at 5.) Furthermore, there is a statewide ban on commercial fishing of striped bass, which is in effect to protect the population of the fish. (*See* NYS DOH Health Advisories: Chemicals in Sportfish and Game, 1998–99.) As a result, humans are not permitted to catch or consume the type of fish collected in the DEC sample. Therefore, it is unlikely that humans would consume striped bass that are contaminated with PCBs above the New York State accepted levels. Thus, a genuine issue of material fact also exists as to whether the Site

presents an imminent and substantial endangerment to humans.

### B. *Mink Endangerment*

Plaintiffs also argue that the Site presents an imminent and substantial endangerment to mink. They rely once again on Huddleston, who theorizes that because "fish may comprise up to 34% of the winter diet of the Hudson River mink," such mink would eat juvenile fish contaminated by the waters adjacent to the Site. (Huddleston Report at 16–17.) Huddleston's report does not mention striped bass, and does not discuss the mink habitats or whether mink would likely feed near the Site. Jenkins once again disputes Huddleston's conclusions, finding that "the habitat at the Site [90% paved and developed] and the immediate vicinity is of poor quality for mink." (Jenkins Report at 11.) He found the nearest mink habitat over a mile north of the Site, across the Hudson on the west shore. (*Id.* at 12.) Finally, he concludes that

> given the poor quality of the habitat on the east shore relative to that available on the west shore, the distance from the Site and the size of the current river ... male mink living on the western shore of the river would not forage to any significant degree in the areas immediately adjacent to the Site.

(*Id.* at 12–13.) The conflicting views in the respective expert reports raises a genuine issue of material fact as to whether the Site presents an imminent and substantial endangerment to mink.

The court's role at this stage of the litigation is not to decide genuine issues of material fact, but to discern whether any exist. *See Gallo*, 22 F.3d at 1224. In light of the disputes between the various experts, we find that genuine issues of material fact exist as to whether the Site presents an imminent and substantial en-

dangerment to health or the environment under RCRA.[7] Furthermore, given the strong precedent in this Circuit disfavoring granting summary judgment in RCRA cases when faced with such conflicting expert opinion, *see, e.g., See, e.g., Kara Holding Corp.,* 67 F.Supp.2d at 312; *Orange Env't,* 860 F.Supp. at 1028–29; *Gache,* 813 F.Supp. at 1042–43, we must deny plaintiffs' motion.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment as to ARCO's liability is denied.

SO ORDERED.

---

7. Plaintiffs' claims that the Site represents an imminent and substantial endangerment to benthic organisms and that the Site is currently leaching contaminated material are also refuted by ARCO's experts. (*See* Def. Mem. Opp. Summ. J. at 34 n. 17 (benthic organisms), 36–38 (leaching).)