DMJ ASSOCIATES, L.L.C., Plaintiff,

v.

Carl A. CAPASSO, et al., Defendants.

No. 97 CV 7285(RJD).

United States District Court,
E.D. New York.

Sept. 3, 2003.

Michael D. Goodstein, Resolution Law Group, P.C., Washington, DC, Barbara Guibord, Fognani, Guibord, Homsy & Roberts, Chicago, IL, for plaintiff.

Robert R. Leinwand, Robinson, Brog, Leinwand, Greene, Genovese & Gluck, P.C., New York City, David P. Schneider, Bressler, Amery & Ross, Florham Park, NJ, Bonni Fine Kaufman, Hale & Dorr, L.L.P., Washington, DC, for defendants.

## MEMORANDUM & ORDER

DEARIE, District Judge.

Plaintiff DMJ Associates L.L.C. ("DMJ") moves for summary judgment on the issue of whether it has standing to bring this action, and defendants have cross-moved on the same issue. Defendants argue that plaintiff has failed to demonstrate that it has suffered an "injury in fact," or alternatively, that any injury is "fairly traceable" to defendants. For the reasons that follow, plaintiff's motion for summary judgment on the issue of standing is granted and defendants' motion is denied.

## BACKGROUND

This case involves two pieces of property in Long Island City, New York. The first is owned by Carl A. Capasso (the "Capasso Property").[1] Capasso purchased the property in 1979 with a mortgage loan from European American Bank ("EAB"). After Capasso defaulted on the mortgage in 1987, EAB obtained a judgment and instituted a foreclosure action on the property in 1992. The foreclosure action was stayed, however, due to Capasso's pending bankruptcy proceedings, which commenced in 1997.

---

1. The "Capasso property" is made up of three parcels located at 37–30 through 37–32 Review Avenue, 37–98 Railroad Avenue and 38– 20 Railroad Avenue/Newtown Creek in Long Island City, New York.

The second piece of property is adjacent to the Capasso property (the "Quanta Property"). A hazardous waste disposal facility, owned and operated by defendant Quanta, is located on this site. Plaintiff alleges that defendants BASF Corporation, Chemical Leaman Tank Lines, Inc., Clairol, Inc., Consolidated Edison Company of New York, Inc., Exxon Corporation, General Dynamics Corporation, Powell Duffryn Terminals, Inc., The Hitchcock Gas Engine Company, and The Stanley Works, disposed of hazardous waste at the facility at various times during the period of 1973 through 1980.

The Quanta facility was the subject of a cleanup action instituted by New York City (the "City") in 1985. The City brought an action in the Southern District of New York for "recovery of the cost of removal, remedial and other cleanup actions allegedly incurred and to be incurred by the City, and for alleged damage to natural resources, resulting from the alleged release and threatened release of industrial and chemical waste," alleging costs of approximately $2.5 million. In 1987, the City settled the case for $1.6 million. Notably, all but three of the Generator defendants-Clairol, Con Ed and Powell Duffryn-participated in the settlement. Con Ed and Powell Duffryn deny ever having done business with Quanta.

DMJ was formed on October 31, 1996. On the same day, DMJ executed a Confidentiality Agreement with EAB. On November 8, 1996, DMJ purchased EAB's rights and interests in the loan and judgment. DMJ has stipulated that at the time of the purchase, it knew that the Capasso property was potentially contaminated, and as result of that and other factors, it was able to purchase the note at a substantial discount. The purchase agreement defined the "assets" purchased by DMJ to include:

causes of action for (i) environmental conditions at and around the collateral; (ii) breach of contractual obligations arising out of all current and former lease obligations; (iii) environmental conditions which may otherwise impair the use and enjoyment, value, marketability for lease, sale, pledge, or hypothecation, or transferability of the collateral . . . .

Pl.'s Decl., Ex. A. at 3.

In September 1997, DMJ sent each of the defendants a "Notice of Endangerment" pursuant to § 7002(b)(2)(A) of Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(b)(2)(A), informing them of their potential liability for the "endangerment" of the Capasso property. *See* Plaintiff's Statement of Undisputed Facts, Exhibit 1. The Notice demanded that they abate the endangerment and pay DMJ $500,000.00 for initial investigation into the contamination. *Id.* The Notice also explained that DMJ would observe the "90–day waiting/negotiation period prescribed by RCRA," during which "DMJ would be pleased to discuss this matter further" before it would bring suit. *Id.* On December 10, 1997, having received no satisfaction of their demands and after the completion of the 90–day period, DMJ initiated the instant suit.

The complaint alleges that four categories of defendants are responsible for the contamination of the Capasso property. The first category consists of the businesses that Capasso operated on the property. Second, DMJ alleges that the previous owner of the property, Darling International, Inc. ("Darling"), contributed to the contamination. Third, DMJ alleges that the owners and operators of the Quanta facility located on the property adjacent to the Capasso property released pollutants into the ground which contaminated the Capasso property. Finally,

DMJ alleges that the businesses that transported waste to be treated, stored, or otherwise disposed of at the Quanta facility (the "Generator defendants") further contributed to the contamination. All defendants deny responsibility for the contamination. DMJ alleges that the contamination is continuing.

DMJ brings its claims under the citizen suit provisions of RCRA, 42 U.S.C. § 6972(a) and the Comprehensive Environmental Responses Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a). DMJ seeks a declaratory judgment that defendants are jointly and severally liable for the alleged contamination at the Capasso Property, an injunction requiring defendants to either deposit funds sufficient to abate the contamination or to clean up the contamination at their expense, and the costs of litigation including attorneys' fees. DMJ also asserts a New York State public nuisance claim seeking similar relief.

## DISCUSSION

### A. Summary Judgment

Plaintiff moves for summary judgment on the issue of standing. The Generator defendants have cross-moved for summary judgment on the same issue. Summary judgment is appropriate when "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). In deciding a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that there are no genuine issues of material fact. Once the moving party meets this burden, the non-moving party must demonstrate that a genuine issue exists and that the moving party is not entitled to judgment as a

matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

With respect to standing, the party invoking federal jurisdiction bears the burden of proving that the elements of standing are fulfilled. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In a summary judgment motion, the plaintiff may not rest on mere allegations to support standing, but instead, must adduce affidavits or other evidence to prove that the elements are satisfied. *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).

### B. Constitutional Standing

#### 1. Legal Requirements

The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). There are three elements of standing. First, the plaintiff must show that it has suffered an "injury in fact." *Id.* An "injury in fact" has been defined as "an invasion of a legally protected interest which is ... concrete and particularized ... and ... 'actual or imminent, not conjectural or hypothetical.'" *Id.* (citations omitted). More specifically, a party must demonstrate a "distinct and palpable injury to himself." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). A plaintiff's claim cannot be based on "the legal rights or claims of third parties." *Id.* at 499, 95 S.Ct. 2197.

Second, the injury complained of must be " 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' "

*Lujan,* 504 U.S. at 559, 112 S.Ct. 2130 (citations omitted). Additionally, the alleged injury must not have been the result of the party's own actions or inactions. *See Jackson–Bey v. Hanslmaier,* 115 F.3d 1091, 1095 (2d Cir.1997) (finding that plaintiff had no standing to bring a § 1983 action because any injury that he suffered was the result of his failure to properly register his religion with the Bureau of Prisons); *Petro–Chem Processing, Inc. v. EPA,* 866 F.2d 433 (D.C.Cir.1989) (holding that an organization lacked standing to challenge allegedly lax EPA regulations of hazardous waste because its members did not have to follow the lax procedures).

Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan,* 504 U.S. at 559, 112 S.Ct. 2130 (citations omitted). The party asserting standing bears the burden of establishing the three elements of standing. *Id.* Simply put, the plaintiff must demonstrate that it has "'a personal stake in the outcome of the controversy.'" *Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

In addition to the Article III requirement of standing, federal jurisdiction may also be limited by "prudential limitations." *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997). "Prudential limitations" are "judicially self-imposed limits on the exercise of federal jurisdiction ... founded in concern about the proper-and properly limited-role of the courts in a democratic society." *Id.* However, unlike the Article III requirement of standing, Congress may choose to abrogate "prudential limitations" when enacting statutes that authorize private causes of actions. *Id.* at 1161–62. Therefore, where Congress has authorized the use of the judicial process, "the inquiry as to standing must begin with a determination

of whether the statute in question authorizes review at the behest of the plaintiff." *Sierra Club,* 405 U.S. at 732, 92 S.Ct. 1361.

■ The environmental laws at issue in this case specifically address who may bring an action. Under RCRA,

> Any person may commence a civil action on his own behalf ... against any person ... including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a) (1998). Under CERCLA,

> Any person may commence a civil action ... against any person ... who is alleged to be in violation of any standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter.

42 U.S.C. § 9659(a) (1998). Through the use of the terms "any person," it is clear that Congress intended to confer standing to the full extent permitted by Article III. *See Bennett,* 117 S.Ct. at 1163 (commenting that the use of "any person" in the Endangered Species Act was an "authorization of remarkable breadth"). Thus, Congress has abrogated the prudential standing requirements under these statutes, and the only question at issue in this case is whether plaintiff has standing under Article III of the Constitution.

2. Analysis

■ At the outset, to establish constitutional standing, plaintiff must show that it has suffered an "injury in fact," "distinct and palpable" to itself. *Whitmore v. Ar-*

*kansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). DMJ asserts that it has sustained an injury in fact within the meaning of Article III in two ways: first, it has been injured by the contamination of the Capasso property, of which it is the mortgage judgment holder, and second, it has been and continues to be injured by defendants' failure to fulfill its legal obligation to abate the endangerment, on which plaintiff relied when purchasing its interest in the property.[2]

Defendants first argue that the contamination cannot constitute plaintiff's injury because plaintiff does not own the property. While it is true that plaintiff does not own the Capasso property, plaintiff does have a security interest in the property, specifically a defaulted mortgage interest in the property, for which foreclosure proceedings have been commenced. These proceedings are currently stayed due to Capasso's bankruptcy.[3] The Court finds such a legal interest in the Capasso property to be sufficient for injury-in-fact standing purposes. Indeed, the value of plaintiff's interest in the property, while stipulated for the purposes of this motion not to have been negatively affected since the date of purchase, will inevitably be affected by the continuing contamination that is alleged. Moreover, plaintiff will at the end of foreclosure proceedings either hold title to the property or realize the proceeds of the sale. Thus, plaintiff has a distinct economic as well as legal interest in the condition and value of the property—enough to provide it with standing to sue for cleanup of the contamination. The case that defendants cite, *Alloy Briquetting*, does not hold otherwise. *See Alloy Briquetting Corp. v. Niagara Vest, Inc.*, 756 F.Supp. 713 (W.D.N.Y.1991) (holding that an evicted plaintiff has no legal interest in property and therefore has no standing to bring a CERCLA claim). Moreover, as *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149 (4th Cir.2000) holds, the injury-in-fact requirement is meant to "preclude[ ] those with merely generalized grievances from bringing suit to vindicate an interest common to the entire public." *Friends of the Earth*, 204 F.3d at 156. DMJ's security interest in the property clearly provides it with much more of a stake in the outcome of the litigation than members of the general public.

■ Defendants also argue that plaintiff has not been "injured" per se, or that if

---

**2.** Plaintiff cannot rely on its own liability under CERCLA to provide it with an injury in fact, since at present, it has no liability. Section 107(a)(2) of CERCLA defines a "potentially responsible person" to include "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). The Second Circuit has held that even a landowner who was unaware of, and not involved in, the contamination of the property is still a "responsible person" under CERCLA. *Bedford Affiliates v. Sills*, 156 F.3d 416, 425 (2d Cir.1998). Secured creditors, however, are not held liable. *See East Bay Mun. Util. Dist. v. United States Dep't of Commerce*, 142 F.3d 479, 483 (D.C.Cir.1998) (quoting 42 U.S.C. § 9601(20)(A) 1998). Thus, in its current posture as a secured creditor of the Capasso

property, DMJ presently has no liability under CERCLA for the contamination of the Capasso property.

**3.** Defendant asserts that plaintiff cannot foreclose on the Capasso property and is also barred from bringing the instant litigation because of New York's champerty law. As discussed in Section C, *infra*, the Court finds plaintiff's purchase of EAB's interest in the property not to violate New York champerty law. Accordingly, when the Capasso property emerges from bankruptcy, plaintiff will not be barred by champerty laws from foreclosing. *See Rosenkrantz v. Salvo Realty Corp.*, 65 Misc.2d 467, 317 N.Y.S.2d 809 (1971) (champerty statute does not bar an assignment of a mortgage then in foreclosure to a corporation intending to continue the foreclosure.)

the Court considers him injured, such injury is "self-inflicted" and not "fairly traceable" to defendants, since plaintiff knew of the contamination at the time of purchase and such information was factored into the discounted purchase price. Plaintiff admits that it purchased the security interest at a substantial discount with the knowledge that the property was contaminated; indeed, it paid only $200,000 for a $10,000,000 security interest in the Capasso property. Moreover, plaintiff acknowledges that there has been no decline in value of its security interest since the date of purchase.

The fact that DMJ knew about the contamination at the time it purchased the security interest, however, does not by itself prevent DMJ from showing that it has an injury-in-fact. Indeed, the Third Circuit has concluded that the defense of *caveat emptor* does not apply to actions brought under CERCLA. *Smith Land & Improv. Corp. v. Celotex*, 851 F.2d 86 (3d Cir.1988). In *Smith*, the plaintiff "was a sophisticated company which had inspected the land on five occasions, [knew] of its past use, and admitted that the [existence] of waste was a 'negative' factor in the decision to buy the land." *Id.* at 87. Indeed, the purchase price reflected the "possibility of environmental risks." *Id.* The Third Circuit reasoned that the doctrine of *caveat emptor* would "frustrate Congress' desire to encourage clean up by any responsible party." *Id.* at 89. The Court noted, however, that the amount of the discount paid by the plaintiff for the land could be considered in determining the allocation of contribution among the defendants. *Id.* at 90.

Relying on the *Smith* decision, a District Court in the Western District of New York also rejected defendants' argument that the purchaser of contaminated land could not bring an CERCLA action to compel defendants to clean up past contamination merely because the purchaser had knowledge of the contamination at the time of purchase. *Westwood Pharmaceuticals, Inc. v. National Fuel Gas Dist. Corp.*, 737 F.Supp. 1272 (W.D.N.Y.1990). The District Court agreed with the Third Circuit's reasoning that the doctrine of *caveat emptor* is "clearly inconsistent with Congress's intent, in enacting CERCLA, to provide for swift clean-up of hazardous substances by all responsible parties under a uniform scheme." *Id.* at 1280.

■ The main purposes of CERCLA "'are prompt cleanup of hazardous waste sites and imposition of all cleanup costs on the responsible party.'" *Meghrig v. KFC Western*, 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (citations and internal quotations omitted). Similarly, the main purposes of RCRA are to reduce "the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Id.* citing 42 U.S.C. § 6902(b) (1988). The Court recognizes the important public policy that the federal environmental laws serve and Congress' clear intention to allow a broad range of persons to bring actions to enforce these laws when local and federal authorities are either unwilling or unable to take action.

Analogizing from the *Smith* and *Westwood* decisions, this Court finds that the doctrine of *caveat emptor* cannot be utilized to defeat the purposes of the environmental statutes through an asserted standing defense. To deny standing to anyone who purchases an interest in property with foreknowledge of the contamination, which is then factored into the purchase price, would establish a perverse incentive for buyers to remain ignorant of the potential contamination of the land they seek to

purchase an interest in, and would limit the effectiveness of CERCLA and RCRA to all but the most naive of investors. Indeed, why should standing be denied to DMJ but afforded to a less savvy investor who might not have performed due diligence before purchasing the Capasso judgment and bid a higher price for the note, only to see its value decline upon discovery of the contamination? While such an investor might more clearly be economically "injured," the distinction between that investor's interest in having the property's contamination abated and DMJ's is not at all clear.

Indeed, DMJ's research into the contamination of the property and the legal obligation of the responsible parties to abate it does not appear to be what courts have had in mind when they have denied standing for self-inflicted injuries. In *Petro–Chem*, for example, the Court held that plaintiffs' potential future liability for utilizing EPA-permitted lax disposal methods would be "voluntarily incurred" and therefore not fairly traceable to defendants because plaintiffs could still opt to use other disposal methods. *Petro–Chem*, 866 F.2d at 438. Such a situation is distinguishable from plaintiff's situation since here, plaintiff cannot engage in any future alternative activity to avoid harm: the harm created by the contamination to the Capasso property has already occurred and continues to occur. Similarly, in the other case cited by defendants, *Jackson–Bey v. Hanslmaier*, the Second Circuit found that plaintiff's injury resulted "from his own decision not to follow the simple procedure of registering his religion," therefore any injury-in-fact he suffered was self-inflicted and thus insufficient for standing. *Jackson–Bey v. Hanslmaier*, 115 F.3d at 1095. In the instant case, there was no simple, clearly-delineated procedure that plaintiff could have followed which would have saved it from injury. Defendants try to argue that DMJ did not have to purchase the note in the first place, and that had it abstained, it would not have been harmed. However, such an argument is unpersuasive and overbroad: it would deprive all those who purchased contaminated land with foreknowledge of the contamination from ever bringing suit under RCRA or CERCLA, in clear contravention of their statutory purpose. Consequently, the Court finds that any harm plaintiff has suffered is not self-inflicted, and it will not deny plaintiff standing on those grounds.

Moreover, as the Court has indicated above, it finds that plaintiff has established sufficient "injury-in-fact," albeit of a non-traditional kind. Indeed, although defendants maintain that plaintiff cannot point to any specific "harm" it has experienced since it has not had any outright monetary loss, it is not clear that the constitutional injury-in-fact requirement calls for the delineation of such a concrete economy injury. Indeed, "injury in fact" seems to be more loosely defined by courts as requiring a "personal stake in the outcome" of the litigation, (*O'Shea v. Littleton*, 414 U.S. 488, 493, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Sierra Club v. Morton*, 405 U.S. 727, 731–32, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)), the "invasion of a legally protected interest," (*Lujan*, 504 U.S. at 559, 112 S.Ct. 2130) or the denial of a concrete future benefit to which the plaintiff would be legally entitled, if not for the actions or omissions of the defendant. *See Singleton v. Wulff*, 428 U.S. 106, 113, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). In *Singleton*, for instance, the Supreme Court held that the plaintiff-physicians had suffered a "concrete injury" from the passage of a statute which denied the physicians Medicaid reimbursement for performing abortions. *Id.* As the Court stated,

If the physicians prevail in their suit to remove this limitation, *they will benefit,* for they will then receive payment for the abortions. The State (and the Federal Government) will be out of pocket by the amount of the payments. The relationship between the parties is classically adverse, and there clearly exists between them a case or controversy in the constitutional sense.

*Id.* (emphasis added). Similarly, in the instant case, should plaintiff prevail, it will benefit economically by having the land de-contaminated by the responsible parties, and the defendants will be "out of pocket" for the cost of the decontamination. As these above-cited cases suggest, such "adverseness" of the parties over a "legally-protected interest" or a particularized "benefit" which may result from the litigation, may be adequate to establish a constitutional "injury-in-fact." [4]

Defendants have also argued that such injuries are too speculative, constituting "someday intentions" which do not support a finding of actual or imminent injury. *Lujan,* 112 S.Ct. at 2138, 112 S.Ct. 2130. The Court, however, finds plaintiff's injury to be clearly distinguishable from the "someday intentions" of the individuals in *Lujan* whose aesthetic and recreational interests in seeing endangered species in their habitats were not linked to a specific time period, but were rather only expressed with regard to some indefinite

time in the future. In contrast, plaintiff's "injury-in-fact," namely the contamination of the underlying property and plaintiff's future lost profit due to the diminution of the property value collateralizing its note, is temporally limited: plaintiff is presently injured by the contamination and will continue to be injured by its impairment of the property's value until it is abated. Thus, the Court finds that plaintiff's "injury-in-fact" is imminent and temporally-bounded enough to satisfy Article III.

Lastly, the Court is mindful of the fact that numerous courts have held that the injury-in-fact "need not be substantial .... [a] trifle is enough for standing." *Joseph v. Civil Service Commission,* 554 F.2d 1140, 1145 (D.C.Cir.1977), *citing United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Moreover, the citizen suit provisions and the underlying legislative purpose of CERCLA and RCRA suggest to this Court that Congress wished all who have suffered any harm from environmental contamination to assist the government in having the contamination abated. Together, these factors lead the Court to conclude that plaintiff has presented sufficient evidence to demonstrate an injury-in-fact for constitutional standing.

▮ The Court is also persuaded that plaintiff satisfies the other prongs of the constitutional standing inquiry. The second prong, namely the causal connection

---

4. Another way of looking at plaintiff's injury is that it is suffering from the economic loss in the value of its collateral, which due to the contamination, is worth much less than it would otherwise be (i.e. $20 million, the amount of the defaulted loan the property is securing). While this diminution in value may not translate directly into a present loss to plaintiff in the profit and loss sense since plaintiff purchased its interest in the land at a discount, it does translate into assured future lost profits when plaintiff either takes title to the land or sells it at the foreclosure sale.

The loss is thus the diminution in value of the land caused by the contamination, which translates into lost profits for plaintiff. The Court finds such a particularized loss to be sufficient for injury-in-fact purposes. *See Association of Data Processing Service Orgs., Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) ("Certainly he who is likely to be financially injured may be a reliable private attorney general to litigate the issues of the public interest in the present case.") (internal quotations and citation omitted)

between the injury and the complained of conduct, need not be proven with scientific certainty, (*see Mancuso v. Consolidated Edison Co. of New York*, 130 F.Supp.2d 584, 593 (S.D.N.Y.2001)), and is distinct from the question of whether plaintiffs have a meritorious claim. *See Lerman v. Board of Elections in the City of N.Y.*, 232 F.3d 135, 143 n. 9 (2d Cir.2000). Indeed, the Supreme Court has established a low causation threshold for standing purposes, stating that a "substantial likelihood" that defendant's actions caused plaintiff's harm confers standing. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Hudson Riverkeeper Fund, Inc. v. Atlantic Richfield Co.*, 138 F.Supp.2d 482, 485 (S.D.N.Y.2001). The Court finds that plaintiff's presentation of the ERM–Northeast Phase II environmental impact study, the evidence that defendants either used, handled or disposed of hazardous substances at the adjoining Quanta facility, and its allegation that the hazardous substances found on the Capasso site may have been released from the Quanta facility and traveled through groundwater and the environment to contaminate the Capasso site, constitute sufficient evidence to demonstrate a "substantial likelihood" that defendants' actions caused the Capasso contamination. While the Generator defendants assert that they had no connection whatsoever with the Capasso property and only had contact with the adjoining Quanta property, such an assertion goes to the merits of the case and is irrelevant for purposes of the standing inquiry. Moreover, the Court has above rejected defendants' argument that plaintiff's injury is self-inflicted, and below

disposes of defendants' alternative argument that plaintiff's conduct was champertous. Lastly, it is uncontested that plaintiff's economic injury will be redressed by a favorable decision requiring defendants to abate the contamination of the property. Consequently, the Court concludes that plaintiff has established a basis for constitutional standing in this case, and its motion for summary judgment on this ground is granted.

## C. Champerty

Defendants also argue that plaintiff is barred from bringing this action because plaintiff's purchase of EAB's rights to the property violates New York's champerty statute. The Court disagrees. Under the New York champerty statute, no corporation shall "buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon." N.Y. Jud. Law § 489 (McKinney's 1983). Courts have held that this statute should be narrowly interpreted. *See, e.g., Elliott Associates, L.P. v. Banco de la Nacion*, 194 F.3d 363, 372–73 (2d Cir.1999). Indeed, a defendant must show that "the assignment [was] made for the very purpose of bringing suit and this implies an exclusion of any other purpose." *Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 28 N.Y.2d 325, 330, 321 N.Y.S.2d 857, 270 N.E.2d 691 (1971).[5]

While the Court is not persuaded by plaintiff's argument that the champerty law only forbids purchasing a note for the

---

5. As the *Elliott* opinion notes throughout, the main mischief that the champerty statute aimed to cure was "the prevention of oppression by unnecessary litigation which would follow from the right of an attorney to purchase a claim for the sole purpose of enforcing it in the courts and getting costs therefrom." *Elliott* at 377, quoting *Beers v. Washbond*, 86 A.D. 582, 584, 83 N.Y.S. 993, 994 (3d Dep't 1903).

purpose of suing to recover on the value of that note, it finds that DMJ's purchase does not violate the champerty statute for another reason. Indeed, based upon the undisputed evidence before the Court, it is clear that plaintiff's primary or sole purpose in purchasing EAB's rights to the Capasso property was not to bring suit, but rather to effect cleanup of the contaminated property and to profit therefrom. Such a purpose can be inferred from the purchaser or assignee giving a defendant notice and an opportunity to cure before bringing suit, which DMJ clearly did in sending defendants the Notice of Endangerment. *See 1015 Gerard Realty Corp. v. A & S Improvements Corp.*, 91 A.D.2d 927, 928, 457 N.Y.S.2d 821, 822 (1983) ("[that] the purpose in purchasing the mortgage was not to bring suit is evident from the offer of plaintiff to permit the defaults to be cured"). In such instances, the bringing of the suit is found by courts to be "incidental" to the "primary goal," which in the case of *1015 Gerard,* was to be paid in full, and for DMJ, is to have the property decontaminated and reap the full value of the note. *See Elliott* at 379. The fact that a plaintiff subsequently brings suit after the defendants fail to agree to its demands does not alter the result. As *Moses v. McDivitt,* 88 N.Y. 62, 1882 WL 12577 (1882), the seminal New York Court of Appeals champerty case, states, a purchase of debt obligations "is not made illegal by the existence of the intent on [the purchaser's] part at the time of purchase, which must always exist in the case of such purchases, to bring suit upon them if necessary for their collection." *Moses,* 88 N.Y. at 65. Or as *Limpar Realty Corp. v. Uswiss Realty Holding, Inc.* 492 N.Y.S.2d 754, 756 112 A.D.2d 834, 836–7 (1st Dep't 1985) states, "There is no violation of Judiciary Law Sec. 489, which is violated only if the primary purpose of the taking by assignment was to commence a suit and not where some other [legitimate business] purpose induced the purchase, and the intent to sue was merely incidental and contingent." Accordingly, the Court finds that DMJ had a legitimate business purpose in purchasing EAB's rights to the Capasso property, and that the purchase did not violate New York champerty laws.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted and defendants' is denied.

SO ORDERED.